895 So.2d 503 (2005)
Barbara Michelle GREENE, Appellant,
v.
Robert Charles GREENE, Appellee.
No. 5D03-3613.
District Court of Appeal of Florida, Fifth District.
February 11, 2005.
Rehearing Denied March 17, 2005.
*505 R.W. Simmermon, Winter Park, for Appellant.
Steven J. Guardiano, Daytona Beach, for Appellee.
SHARP, W., J.
Barbara Michelle Greene (Michelle) appeals from a final judgment which dissolved her marriage to Robert Greene (Robert). She argues the trial court erred in denying her permanent periodic alimony, or lump sum alimony, or rehabilitative alimony, or some combination of those awards. She also argues the court erred in calculating the child support obligations of Robert for the parties' three minor children by imputing to Michelle a net monthly income of $2,837.35 per month. We agree.
Robert also sought to cross-appeal the trial court's award of attorney's fees to Michelle, based on the disparity in their earnings. Since the trial court reserved jurisdiction to determine the amount, we declined to address this issue as non-final. However, on remand the trial court may re-address that issue, should it be appropriate, after devising an alimony award for Michelle.
The record establishes that the parties married on May 16, 1987 and separated on March 29, 2002, a fifteen-year marriage. They have three minor children: a daughter, Lindsey, born in 1989, a son, Ryan, born in 1993, and a son, Matthew, born in 1998. The parties stipulated that Michelle would be the primary residential parent and Robert would have reasonable visitation. Left to be resolved at trial were the equitable distribution of the parties' marital assets and liabilities, alimony for Michelle, the amount of child support to be awarded, and an award of attorney's fees for Michelle.
Robert was 40 years old at the time of the trial, with no health problems. He worked for Lockheed Martin during the parties' marriage and was promoted three and one-half years prior to the dissolution, to the position of purchasing manager in the missiles and fire control division. He *506 earns a gross income of $6,055.00 per month (more than $72,000 per year), with a net monthly income of $5,062.00. These figures do not include merit raises (5% of his salary), which he received during the past five years, and benefits including health insurance and a matching 401K pension program.
Michelle was also 40 years old at the time of the trial. She has a Bachelor of Science degree in nursing and she worked as a registered nurse full time, at the beginning of the marriage, in a hospital neonatal intensive care unit. Six months after the parties' marriage, she began working only part time. She was under stress and had suffered two miscarriages and the parties agreed she should not work full time. After the children were born, the parties made a joint decision she would only work part time, during the weekends, so that she could care for the children during the week and he would care for them while she worked.
Six years prior to the parties' separation, Michelle stopped working even part time. The parties made a joint decision she would work only long enough to pay off the mortgage on their home, and then she would stay home and care for the children. Robert testified he agreed to this to accommodate Michelle's wishes. In any event, she did so and this event coincided with the time when Ryan was diagnosed with pervasive developmental delay and ultimately, autism.[1]
Michelle and others testified that because Michelle's license to practice nursing had expired, she was not able to immediately re-enter the nursing profession. She would have to pay a $200.00 fee to the state Board of Nursing and another such fee to the National Council of State Boards, study for a Board exam similar to the one she passed after graduating from college, and sit for and pass the examination.
However, Michelle testified she did not want to re-enter the nursing profession because of the stress and long hours required, and because of various health problems she suffered which would make nursing difficult for her.[2] Further, she testified she could not work full time as a nurse and care for her three children. *507 The children, she testified, have special needs and require her full-time presence in the home.
The evidence established that Ryan, age 10 at the time of trial, has mild to moderate autism and an IQ of 67. This condition affects his ability to interact with other people and impacts his emotional reaction to events. He is prone to having outbursts and tantrums, and does not adjust to or accept change in his routine. Michelle testified Ryan requires assistance in bathing, dressing, cutting up food, tying his shoes, and doing his homework. He also suffers from migraine headaches and endures 2-6 hours of vomiting and screaming once a month. He missed 7 days of school last year, which required Michelle to stay home with him.
Ryan is in special education classes for all academic subjects, and needs constant supervision, almost one-on-one.[3] He did not do well in public summer school classes he attended the year of the trial, because of the lack of close supervision and the change in his routine. His behavior has become a problem.
Ryan's special education teacher who worked with him during summer school,[4] corroborated Michelle's testimony concerning Ryan's lack of social skills and inability to complete his work individually without assistance or supervision. Robert testified he thought Ryan would do well in a normal after-school program, although that was disputed by Michelle and Ryan's teacher. No one at the trial knew of any after-school or summer-school programs which would meet Ryan's special needs.
The evidence also established that Lindsey, although intelligent and in the gifted program, has been diagnosed with obsessive-compulsive disorder and is a fearful, anxious child. She takes medications and sees a psychologist every-other week.[5] She has panic attacks and hyperventilates. She is seeing a cardiologist because when she was 6 or 7 years old, she had tachycardia and was treated for a year with medication. She missed 13 days of school last year and Michelle had to stay home with her. She also often needs her mother's comfort and reassurance during the night time.
Matthew is healthy, happy and well adjusted. However, he is a young child just entering kindergarten, at the time of the trial.
Michelle testified about what her day as the care-giver for these children was like. It starts at 5:30 a.m., ironing clothes and preparing lunches, making breakfast, and dressing and grooming the boys. At 7:30 a.m., she drives Ryan and Matthew to school and returns to pick them up in the early afternoon. In the interim, she does grocery shopping, cleans house, handles lawn care and runs errands, including taking the children to doctor's appointments. In the afternoon, she brings the boys home and gives them a snack. They may go swimming or play. She testified she cannot leave Ryan alone for extended periods of time and does not permit him to play outside alone.
*508 In the late afternoon, she helps them with homework, prepares dinner and gets them ready for bed. She also picks up Lindsey some afternoons when Lindsey participates in after-school activities, such as the band, and cannot come home on the school bus. The children also want to participate in extra-curricular activities such as gymnastics, Karate, and piano lessons, which will require Michelle's supervision and transportation. They have enjoyed such activities in the past, but Michelle testified she would need extra financial support to pay for them.
Michelle testified that if she had to work, even part time, she would have to hire a nanny to handle the child care-taking and homemaking activities she performs. She investigated the cost of hiring such a person with a professional employment association and was told it would be a minimum of $2,000.00 per month. No one outside of the immediate family has ever watched or babysat for Ryan.
The trial court equally divided the parties' marital liabilities, which included the debt obligation ($11,039.42) owed on Robert's 2001 Nissan Frontier truck, which he valued at $10,070.00. Although the judgment did not expressly so provide, Robert received the truck and Michelle received her Voyager mini-van, in poor repair, which she valued at $700.00 (trade-in value from a dealer).
The court equally divided the parties' household furnishings, U.S. savings bonds valued at $1,064.28, a checking account balance of $1,345.74, and the IRS Child Tax Credit of $1,200.00. It also found that Robert's 401K plan was worth $116,704.49, as of the date of filing the dissolution petition and ordered it equally divided via entry of a Qualified Domestic Relations Order. It also computed the value of Robert's Deferred Compensation Plan and the value of that portion earned by him during the marriage and awarded Michelle one-half of that sum ($500.58 per month) payable on his retirement. Thus there were minimal cash assets distributed to the parties.
The major marital asset of the parties was their marital residence. The parties did not obtain an appraisal of the home and could not agree on its value. Michelle testified it was worth $230,000 and Robert testified it was worth $250,000. The court ordered the residence to be placed for sale at $250,000, and that all offers which the parties did not agree to accept or reject would be submitted to the court for consideration. The residence was subject to a mortgage of approximately $94,000. The court ruled that the parties would equally divide the proceeds after the sale of the residence and in the interim, both would share equally the liability for mortgage payments, but Michelle and the children could continue to live there until it was sold.
Assuming the residence sells for $250,000, the parties will probably realize about $133,500 or $66,750 each.[6] That, together with the other marital assets, does not provide Michelle with enough money to be self-sufficient. Michelle will have to purchase another home for herself and the children, another vehicle in the near future, and pay her half of the parties' debts, which exceeded $30,000.
The trial court ruled that Michelle was not entitled to any form of alimony. It found that the standard of living during the course of the marriage was a "working middle-class standard," and its duration was 15 years. It also found Michelle suffered from irritable bowel syndrome and diverticulitis. It declared it had considered *509 the contributions of the parties to the marriage, including but not limited to "services rendered in homemaking, child care, education and career building of the other party," but made no specific findings as to those services. It also found that Michelle is capable of earning between $18.00 and $25.00 per hour based on past earnings of $22.00 per hour, as a registered nurse. Thus, the court must have reasoned, she was instantly capable of self-support at the level enjoyed during the marriage.
The court denied Michelle rehabilitative alimony because she failed to set forth a "viable plan" which would support such an award, and it denied her request for lump sum alimony in the form of a larger share of the proceeds from the sale of the parties' residence. She argued she needed a larger share of the net proceeds so that she could afford to buy a suitable, less expensive home for herself and the children, and be able to handle a mortgage payment on the new home, and obtain a more reliable vehicle for transporting her family than the old van.
The court also calculated the child support owed by Robert based on imputing to Michelle earnings of $22.00 per hour, 40 hours a week, times 4.3 weeks a month, or $2,837.35 per month. Thus Robert was required to pay $1,598.72 per month in child support, with an additional $400.00 per year to pay for summer school tutoring for Ryan, which Robert volunteered to pay.

I. Permanent Periodic Alimony
The duration of this marriage, 15 years, is in the "grey" area, although on the far upper side of that grey area, where a trial court must consider various factors and weigh equities, in resolving the issue of permanent alimony, and there is no presumption for or against such an award.[7] In this case, we think the trial court abused its discretion in failing to make such an award.
Factors indicating the appropriateness of a periodic permanent alimony award in this case are that Michelle, with the consent and approval of Robert, gave up her professional career to become the home-maker and child caretaker for the parties' three children, for a substantial period of time  6 years.[8] Robert benefitted from this arrangement by not having to take care of the children himself, or pay another to do so, while pursuing a successful career.[9] The children are relatively young and will require continuing home-making and child-care services for an extended period of time and the former wife is the primary residential custodian.[10]
Further, the evidence established that two of the children, Ryan and Lindsey, have special needs and disabilities.[11] *510 Whether Ryan can ever over-come his autism and delayed development and become a "normal" child or adult is in doubt. His need for continuity and supervision almost mandates the presence in the home of a full time care-giver. The cost of hiring a nanny or paying for special after-school care was not figured into Robert's child support calculation. With an award of only $1,598.72 per month in total child support, even assuming Michelle could immediately start earning $2,837.35 (working out of the home 8 hours plus a day, 5 days a week) there is no way she can afford to pay another person for the needed home-making, child-care tasks she has been performing.
In reading the transcript of the trial, it becomes apparent that the trial judge had in mind two incorrect concepts concerning periodic permanent alimony. First, the judge equated an award of permanent periodic alimony to a required finding of physical "disability" on the part of Michelle to work in her prior profession. The judge repeatedly told Michelle's attorney that she had failed to offer any medical evidence that her client was "disabled." It concluded: "If I didn't find her to be disabled, I would have to find that she had some income earning ability." That is a clear misconception about the basis for denying or awarding permanent periodic alimony and grounds for reversal.[12]
Second, the trial judge characterized the parties' standard of living as one in which both parties worked full time, outside the home, to support the family. Although the parties' marriage may have commenced in that form, it changed to Michelle only working as a nurse on weekends, and for the last six years, not at all. That is, however, not to say that Michelle did not work hard and long at the task of home-making and raising the parties' children during the six years prior to the dissolution proceeding. The proper standard of living a judge should consider in this context is the standard enjoyed by the parties towards the end of the marriage.[13] The parties had achieved sufficient earnings, through Robert's success and advancement in his career with Lockheed Martin, to permit Michelle to devote her energies to being a full time home-maker and child care-giver. That is the proper standard in this case.[14]

II. Rehabilitative Alimony.
Michelle testified that she had a plan to return to a college or university to obtain an educational specialist degree in school psychology. This career would allow her to work in the school system and be on her children's schedule, and thus continue to be able to perform her role of home-making and child care. The degree is between a master's and a doctorate. She could obtain this degree at UCF. It would require 92 credit hours and cost $207.00 per credit hour. She would need $1,500.00 to $2,000.00 per month in alimony for support while obtaining that degree.
She testified that she could complete the degree on a part-time basis, while still taking care of the children, over a six-year period. It is normally a four-year program. She would have to obtain a Graduate Record Exam score of 1000, apply to a *511 graduate program and be accepted. She would have to study for the GRE and take it in November, then apply by March 1st 2004 to UCF. She testified she has the capacity and education to succeed in this goal and if successful, her earning potential would be $46,000.00.
The trial court found this plan not to be viable. At trial, the court questioned why Michelle had not already taken the GRE and offered in evidence a suitable score and why she had not applied to and been accepted in a suitable graduate program. In the final judgment, the court stated it had denied rehabilitative alimony because:
[T]he Petitioner failed to present a letter of acceptance at any educational institution that provides such an education; the Petitioner failed to present an application for admission to an educational institution that provides such an education; the Petitioner failed to present evidence of results of the Graduate Record Exam, which is required for such an educational endeavor. Because no evidence of testing results or any other evidence from which the Court can draw a reasonable inference that the Petitioner's plan is viable, the Court finds that the plan is not viable.
It also concluded that the plan would take too long and that Michelle already has sufficient education and training as a nurse and can earn an adequate amount to be self-supporting in that profession.
Michelle testified she did not want to become re-licensed and work again as a nurse. She explained the job is very demanding and the hours long and stressful. It would make it very difficult for her to care for her special needs children. She also testified that her physical problems, established by medical records stipulated in evidence that she has irritable bowel syndrome and diverticulitis, would make it difficult and uncomfortable for her to function as a nurse in a hospital setting.
Courts have found rehabilitation plans viable or potentially viable on less or even similar testimony and evidence, as was presented in this case.[15] The fact that Michelle has a Bachelor of Science degree from a state university and has passed the Boards to become a registered nurse indicates she is certainly capable of passing the GRE, and doing graduate work. It is not necessary for a spouse to produce letters of acceptance from an educational institution, or test scores on the GRE to establish a viable rehabilitation plan.
At the trial, counsel for Robert suggested that some form of interim alimony might be appropriate in this case, because as the evidence established, Michelle could not immediately begin earning $2,837.35 per month. She would have to pay $400.00 in fees to re-take the Board exams, since her nursing license had expired. And, she would have to study for the exams and pass the Boards when they were given. Thus her ability to become re-employed as a registered nurse in any capacity and to arrange care for her children, and find a new home for them, was realistically perhaps a year in the future.
However, the court rejected the concept of any kind of "bridge the gap" rehabilitative alimony because it lacked evidence of the level of support Michelle needed, and it rejected the concept of the award lasting for one year. However, counsel for the wife offered affidavits and testimony that Michelle needed at least $1,500.00 to cover her basic needs and expenses, once the parties' expensive marital residence was *512 sold. Even if a former spouse must work outside the home, part time or other, some consideration must be given to meeting the spouse's needs in the interim before he or she can be expected to be earning income, and thus rightfully "imputed" with earning it.[16]

III. Lump Sum Alimony.
Michelle requested that in addition to permanent or rehabilitative alimony, that it award her the major part of the proceeds to be realized on sale of the marital home. She testified she needed this resource in order to be able to afford to buy a home for herself and the children and to replace the vehicle she had been driving because it was old, broke down often, and was expensive to repair.
An award of lump sum alimony as support requires proof of special circumstances, where other forms of alimony are not available or appropriate.[17] It is also a matter left to the discretion of the trial judge. In this case, because other forms of alimony were available and because the marital home was the parties' major marital asset, we do not find the court abused its discretion in denying lump sum alimony, had it awarded some other form of alimony.[18]
However on remand, the court should re-consider some form of lump sum alimony, along with the other forms of alimony, to remedy the apparent inequity of making both Michelle and Robert equally liable for the debt owed on the Nissan truck, which he apparently received, post judgment.[19] She, in turn, apparently received the van worth only $700, which needed to be replaced, without sufficient resources to do so.

IV. Imputing Income.
If a court awards permanent alimony or rehabilitative alimony, or denies them, it may impute some income to a former spouse. The fact that a former spouse can earn some income does not disqualify a spouse from receiving alimony.[20] The two are not mutually exclusive, but there must be some realistic basis in the evidence to support the concept that a former spouse can earn the sums imputed.
An additional error in this case, apparent from our reading of the transcript of the final hearing, is that the trial judge placed the burden of proof on Michelle to show she was not voluntarily unemployed or underemployed rather than on Robert.[21] That is contrary to current *513 case law.[22]
The evidence simply does not support the trial court's finding that Michelle can immediately start earning $2,837.35 per month as a registered nurse, because she had earned that amount at the commencement of the parties' marriage.[23] Nor does the child support calculation provide for the cost of child care and home-making for the parties' three children, which Michelle will not be able to provide herself if she works 8 hour shifts as a registered nurse, 5 days a week, taking her out of the home approximately 10 hours or more a day.[24] Given the level of care these 3 children require, imputing full time income to Michelle, their primary custodian, is an abuse of discretion.[25]

Conclusion.
We find that, based on this record, the trial court breached its discretion by failing to award Michelle permanent periodic alimony, rehabilitative alimony, or lump sum alimony, or some combination of these remedies. We also find the trial court erred in its calculation of child support by imputing to Michelle full time earnings as a registered nurse, under the circumstances of this case. If some part-time earnings are to be imputed by the court, a corresponding allowance must be made for child care, particularly in this case, because of the special needs of Ryan.
REVERSED and REMANDED for consideration of an award of periodic permanent alimony, rehabilitative alimony, lump sum alimony, or a combination thereof; and recalculation of the child support award.
SAWAYA, C.J., concurs.
PETERSON, J., concurs in result only.
NOTES
[1] Records stipulated in evidence show that in 1999, Ryan was evaluated by a school psychologist, W. Christian Sorenson, as follows:

Ryan is presently identified as Developmentally Delayed and is receiving his education in a self-contained pre-primary classroom for children with varying exceptionalities. Volusia School Psychologist, Joseph White, evaluated him on 09/19/96 and found him to be delayed in the areas of language development and social skills. Due to refusal to engage in various intellectual tasks, no ability score was able to be obtained. In addition, adaptive behavior as measured by the Vineland, was in the Low classification. There was indication of behavioral characteristics associated with autism.
In his 1999 evaluation, Dr. Sorenson reported that current standardized intelligence testing showed that Ryan was functioning in the intellectually deficient range of intelligence. He obtained a full scale IQ score of 67.
Ryan was also evaluated by his previous teacher, his current teacher and parents on the Childhood Autism Rating Scale (CARS), a rating scale developed to identify children with autism. According to the CARS classification, total ratings from 30 to 37 indicate mild to moderate autism, and ratings from 37 indicate severe autism. Ryan's total ratings from his teachers (36.5 and 35) fell at the upper end of the mildly  moderately autistic range. The total from the parents (31) fell at the low end of the same range. Dr. Sorenson concluded the results of the CARS revealed the possibility of moderate autism.
[2] Irritable bowel syndrome and carpel tunnel syndrome were both conditions established by stipulated medical records in evidence and not disputed by Robert.
[3] Ryan's school records dated June 4, 2003, which the parties stipulated in evidence, indicate Ryan is making unsatisfactory progress in reading and mathematics.
[4] Ryan was in summer school because he failed the FCAT and was going to have to repeat the third grade.
[5] The letter from Lindsey's clinical psychologist, stipulated in evidence, diagnoses her with obsessive-compulsive disorder, with poor insight; is easily overwhelmed and frustrated; needs to have someone available to discuss her thoughts and help her organize them; limited self-esteem.
[6] Robert's attorney estimated 7-9% for closing costs.
[7] Johnson v. Johnson, 847 So.2d 1157 (Fla. 5th DCA 2003); Thomas v. Thomas, 776 So.2d 1092 (Fla. 5th DCA 2001); Young v. Young, 677 So.2d 1301, 1305 (Fla. 5th DCA 1996).
[8] Levy v. Levy, 862 So.2d 48 (Fla. 3d DCA 2003); Walker v. Walker, 818 So.2d 711 (Fla. 2d DCA 2002); Martinez v. Martinez, 761 So.2d 433 (Fla. 3d DCA), rev. denied, 779 So.2d 272 (Fla.2000); Knoff v. Knoff, 751 So.2d 167 (Fla. 2d DCA), rev. denied, 767 So.2d 458 (Fla.2000); Cardillo v. Cardillo, 707 So.2d 350 (Fla. 2d DCA), rev. denied, 725 So.2d 1107 (Fla.1998); Brooks v. Brooks, 678 So.2d 1368 (Fla. 1st DCA 1996); Young v. Young, 677 So.2d 1301 (Fla. 5th DCA 1996); Zeigler v. Zeigler, 635 So.2d 50 (Fla. 1st DCA 1994); Nelson v. Nelson, 588 So.2d 1049 (Fla. 2d DCA 1991),
[9] See Knoff v. Knoff, 751 So.2d 167 (Fla. 2d DCA), rev. denied, 767 So.2d 458 (Fla.2000).
[10] See Gregoire v. Gregoire, 615 So.2d 694 (Fla. 2d DCA 1992).
[11] See Reeves v. Reeves, 821 So.2d 333 (Fla. 5th DCA 2002).
[12] See Bacon v. Bacon, 819 So.2d 950 (Fla. 4th DCA 2002).
[13] See Hill v. Hooten, 776 So.2d 1004 (Fla. 5th DCA 2001); Knoff v. Knoff, 751 So.2d 167 (Fla. 2d DCA), rev. denied, 767 So.2d 458 (Fla.2000); Cardillo v. Cardillo, 707 So.2d 350 (Fla. 2d DCA), rev. denied, 725 So.2d 1107 (Fla.1998); Woodard v. Woodard, 634 So.2d 782 (Fla. 5th DCA 1994).
[14] See Young v. Young, 677 So.2d 1301 (Fla. 5th DCA 1996).
[15] See Layeni v. Layeni, 843 So.2d 295 (Fla. 5th DCA 2003); Pribble v. Pribble, 800 So.2d 743 (Fla. 5th DCA 2001); Vitalis v. Vitalis, 799 So.2d 1127 (Fla. 5th DCA 2001); Short v. Short, 747 So.2d 411 (Fla. 5th DCA 1999).
[16] See Weintraub v. Weintraub, 864 So.2d 22 (Fla. 2d DCA 2003), rev. denied, Case No. SCO4-376, 885 So.2d 389, 2004 WL 2374541 (Fla. Sept. 20, 2004); Bacon v. Bacon, 819 So.2d 950 (Fla. 4th DCA 2002).
[17] Porzio v. Porzio, 812 So.2d 485 (Fla. 5th DCA 2002); Young v. Young, 677 So.2d 1301 (Fla. 5th DCA 1996).
[18] Blanchard v. Blanchard, 793 So.2d 989 (Fla. 2d DCA 2001); Glazner v. Glazner, 693 So.2d 650 (Fla. 5th DCA 1997).
[19] Noe v. Noe, 431 So.2d 657 (Fla. 2d DCA 1983); Harts v. Harts, 383 So.2d 952 (Fla. 3d DCA 1980).
[20] See Cerra v. Cerra, 820 So.2d 398 (Fla. 5th DCA 2002); Vitalis v. Vitalis, 799 So.2d 1127 (Fla. 5th DCA 2001); Young v. Young, 677 So.2d 1301 (Fla. 5th DCA 1996).
[21] For example, in denying an award of permanent periodic alimony, the trial court found "no medical evidence of anything other than diverticulitis on which it can base any finding of any other physical problem on the part of the Petitioner," and during the closing argument of Michelle's attorney, the court's repeated assertions that she had not presented sufficient evidence from which a "reasonable inference of disability" can be drawn.
[22] See Andrews v. Andrews, 867 So.2d 476 (Fla. 5th DCA 2004); citing Blanchard v. Blanchard, 793 So.2d 989, 992 (Fla. 2d DCA 2001).
[23] See Andrews v. Andrews, 867 So.2d 476 (Fla. 5th DCA 2004).
[24] See Layeni v. Layeni, 843 So.2d 295 (Fla. 5th DCA 2003); Bacon v. Bacon, 819 So.2d 950 (Fla. 4th DCA 2002).
[25] See Meighen v. Meighen, 813 So.2d 173 (Fla. 2d DCA 2002).